UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

JACOB ZIMMERMAN AND SEAN SUMWALT,    )
          *Plaintiffs*,              )
                                     )
     *vs*.                           )     1:12-cv-01475-JMS-DML
                                     )
BOARD OF TRUSTEES OF BALL STATE UNI- )
VERSITY, ET AL.,                     )
          *Defendants*.              )

## ORDER

Presently pending before the Court are: (1) Plaintiff Jacob Zimmerman's Motion for Emergency Hearing on Preliminary Injunction, [dkt. 13]; (2) a Motion for Summary Judgment filed by Mr. Zimmerman and Plaintiff Sean Sumwalt, [dkt. 18]; and (3) a Cross-Motion for Summary Judgment filed by Defendants Board of Trustees of Ball State University (the "Trustees"), Jo Ann M. Gora, Alan Hargrave, and Michael Gillilan, [dkt. 25].

## I.
### STANDARD OF REVIEW

A motion for summary judgment asks that the Court find that a trial based on the uncontroverted and admissible evidence is unnecessary because, as a matter of law, it would conclude in the moving party's favor.  *See* Fed. R. Civ. Pro. 56.  To survive a motion for summary judgment, the non-moving party must set forth specific, admissible evidence showing that there is a material issue for trial.  Fed. R. Civ. Pro. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits.  Fed. R. Civ. Pro. 56(c)(1)(A).  A

- 1 -

party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact.  Fed. R. Civ. Pro. 56(c)(1)(B).  Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated.  Fed. R. Civ. Pro. 56(c)(4).  Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially the grant of summary judgment.  Fed. R. Civ. Pro. 56(e).

The Court need only consider the cited materials, Fed. R. Civ. Pro. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson v. Cambridge Indus.*, 325 F.3d 892, 898 (7th Cir. 2003).  Furthermore, reliance on the pleadings or conclusory statements backed by inadmissible evidence is insufficient to create an issue of material fact on summary judgment.  *Id.* at 901.

The key inquiry, then, is whether admissible evidence exists to support a plaintiff's claims or a defendant's affirmative defenses, not the weight or credibility of that evidence, both of which are assessments reserved to the trier of fact.  *See Schacht v. Wis. Dep't of Corrections*, 175 F.3d 497, 504 (7th Cir. 1999).  And when evaluating this inquiry, the Court must give the non-moving party the benefit of all reasonable inferences from the evidence submitted and resolve "any doubt as to the existence of a genuine issue for trial…against the moving party." *Celotex*, 477 U.S. at 330.

That cross-motions for summary judgment have been filed does not automatically mean that all questions of material fact have been resolved.  *Franklin v. City of Evanston*, 384 F.3d

838, 842 (7th Cir. 2004).  The Court must evaluate each motion independently, making all rea-

sonable inferences in favor of the non-moving party with respect to each motion.  *Id.* at 843.

After having assessed the claims of the parties in accordance with the standards outlined

above, the Court concludes that Defendants are entitled to summary judgment.  Therefore, the

Court has made all reasonable factual inferences in favor of Mr. Zimmerman and Mr. Sumwalt.

*See Celotex*, 477 U.S. at 330 n.2.

## II.
### STATEMENT OF UNDISPUTED FACTS

### A.  Ball State's Student Conduct Code

Ball State University ("Ball State") is a state-supported institution of higher education lo-

cated in Muncie, Indiana.  [Dkt. 1 at 2, ¶ 3.]  Jo Ann Gora is the President of Ball State, Alan

Hargrave is Ball State's Associate Vice President for Student Affairs and Director of Housing

and Student Life, and Michael Gillilan is Director of Ball State's Office of Student Rights and

Community Standards ("OSRCS").  [*Id.* at 2, ¶¶ 4-6.]  The OSRCS regulates students' conduct

through implementing and administering the Code of Student Rights and Responsibilities (the

"Conduct Code").  [Dkt. 26 at 3-4, ¶¶ 4, 7.]  The Conduct Code, which applies to "all undergrad-

uate and graduate students of Ball State…and shall be deemed a part of the terms and conditions

of admission and enrollment of all students," [dkt. 26-2 at 8, § 2.4], is posted on Ball State's

website and made available in hard copy, [dkt. 26-1 at 2, ¶ 10].  Students are also provided notice

of the Conduct Code and its rights and obligations during summer orientation and during "Wel-

come Week," a three-day program for incoming freshmen.  [*Id.* at 2, ¶ 9.]  As a condition of en-

rollment, students agree to be bound by the provisions of the Conduct Code.  [*Id.* at 2, ¶ 7.]

Section V. of the Conduct Code provides, in relevant part:

Any student found to have committed or to have attempted to commit the following offenses is subject to the disciplinary sanctions outlined in Sections VI.1 – VI.4 and Section VII (*Student Academic Ethics Policy*).

**5.1    Offenses Against Persons:**

**5.1.1   Harassment** – Conduct towards another person or identifiable group of persons that has the purpose or effect of (a) creating an intimidating or hostile educational environment, work environment, or environment for participation in a University activity; (b) unreasonably interfering with a person's educational environment, living environment, work environment, or environment for participation in a University activity; or unreasonably affecting a person's educational or work opportunities or participation in a University activity. This offense also includes behaviors prohibited in *Sexual Harassment Policy, Appendix J and Anti-harassment Policy, Appendix C.*

\*            \*            \*

**5.1.4   Privacy Violation** – Use of audio, video or photographic devices to make an image or recording of an individual without that person's prior knowledge, or without that person's effective consent when such image or recording is likely to cause injury or distress as determined by a reasonable person. This includes but is not limited to, surreptitiously taking pictures of another person in a private area such as a residence hall room, a public or private restroom, or a dressing/locker room.

[Dkt. 26-2 at 10-11.]

**B.  The Alleged Conduct Code Violations**

In the Fall of 2011, Mr. Zimmerman and Mr. Sumwalt (collectively, "the Students") were both enrolled at Ball State.  [Dkt. 1 at 3, ¶ 9.]  The Students had previously lived in an off-campus apartment with another male Ball State student (the "Target").[1]  [*Id.* at 3, ¶ 10.]  While living together, the Students had a number of disagreements with the Target.  [*Id.* at 3, ¶ 11.]  During one school vacation, while the Target was out of the apartment, the Students placed a sandwich in his bedroom and locked the door, leaving the sandwich to rot and preventing the

---

[1] Because the Target is not a party to this litigation, the Court sees no reason to identify him by name.

Target from accessing his room when he returned.  [*Id.* at 3, ¶ 12.]  When the Fall 2011 semester began, the Students moved out of the apartment they shared with the Target and moved in together to another off-campus apartment.  [*Id.* at 3, ¶ 13.]

Shortly after moving out, the Students began playing a prank on the Target which involved creating a Facebook page for a fictitious female high school sophomore named "Ashley." [*Id.* at 3, ¶ 15.]  Using this fictitious Facebook page, the Students posed as "Ashley" and initiated several on-line conversations with the Target.  [*Id.*]  The Students also recruited a fifteen year-old student at Southside High School, "Emily," to pose as "Ashley" in cell phone and text message communications with the Target.  [*Id.* at 4, ¶ 17; dkt. 19 at 3, ¶ 10.]

In mid-October 2011, the Target proposed that he and "Ashley" meet and go to a movie together, and "Ashley" agreed to meet him at a local movie theatre.  [Dkt. 1 at 4, ¶ 18.]  "Ashley" communicated with the Target via text messaging leading up to his arrival at the movie theatre.  [*Id.* at 4, ¶ 19.]  When the Target entered the movie theatre lobby, the Students videotaped him with a cell phone video camera and told him that "Ashley" was fictitious and that the Target had actually been communicating primarily with them.  [*Id.* at 4, ¶ 20.]  The Students then posted their videotape of the Target on YouTube with the title "[the Target] is a pedophile."  [*Id.* at 4, ¶ 21.]  The videotaping and posting of the video did not take place on Ball State property, or at an event held, hosted, sponsored, or sanctioned by Ball State.  [*Id.* at 4, ¶ 22.]  Additionally, the Students did not use any Ball State computers, networks, email, or YouTube accounts.  [*Id.*]

### C.  Ball State's Handling of the Alleged Conduct Code Violations

On November 1, 2011, Dr. Gillilan, Director of the OSRCS, received correspondence from the Target complaining of harassment by the Students.  [Dkts. 26-1 at 2, ¶ 11; 26-6.]  In the correspondence, the Target detailed how the Students left a sandwich to rot in his room when

they were living together, and described the Facebook communications and the ultimate creation

and posting of the YouTube video.  [Dkt. 26-6.]  the Target further stated that, as a result of the

Students' actions, he was having trouble focusing on school because he was in the music college

with the Students and had to see them often, that he was a "nervous wreck," that he was "having

trouble sleeping at night," and that he was "worried about what type of bullying [he] may be a

victim of next."  [*Id.* at 2.]  The Target noted that he sought medical assistance and was pre-

scribed Zoloft "to help [him cope] with this situation," and that the situation "has become ex-

tremely hindering to [his] progress in complet[ing his] degree."  [*Id.*]  He also stated that "[t]hey

have not only mentally ripped me apart, but who is to say they are not planning something physi-

cally harmful."  [*Id.*]

Dr. Gillilan met with the Target on November 2, 2011, and the Target provided further

information and documentation regarding the alleged harassment, including Facebook screen-

shots and YouTube postings and comments.  [Dkt. 26-1 a 2, ¶ 12.]  At the end of the meeting,

Dr. Gillilan considered the OSRCS to be in receipt of a formal complaint from the Target.  [*Id.* at

2, ¶ 13.]

On November 5, 2011, the OSRCS sent the Students letters informing them of their al-

leged involvement in potential violations of the Conduct Code.  [Dkts. 19-3; 26-7.]  The letters

were substantially the same, and stated in part:

> Recently, [the OSRCS] was notified of your involvement in a possible violation
> of the [Conduct Code].  Specifically, you have been accused of policy violation(s)
> that occurred on or around **October 14, 2011** that include but are not limited by
> the following:
>
> **5.1.1   Harassment** – Conduct towards another person or identifiable group of
> persons that has the purpose or effect of (a) creating an intimidating or hostile ed-
> ucational environment, work environment, or environment for participation in a
> University activity; (b) unreasonably interfering with a person's educational envi-
> ronment, living environment, work environment, or environment for participation

in a University activity; or unreasonably affecting a person's educational or work opportunities or participation in a University activity.  This offense also includes behaviors prohibited in *Sexual Harassment Policy, Appendix J and Anti-harassment Policy, Appendix C*.  **Specifically, you are alleged to have – but not limited to – engaged in on-going harassment of [the Target] including locking him out of his room and leaving a sandwich to rot in it while he was away on vacation.**

**5.1.4  Privacy Violation** – Use of audio, video or photographic devices to make an image or recording of an individual without that person's prior knowledge, or without that person's effective consent when such image or recording is likely to cause injury or distress as determined by a reasonable person.  This includes but is not limited to, surreptitiously taking pictures of another person in a private area such as a residence hall room, a public or private restroom, or a dressing/locker room.  **Specifically, you are alleged to have – but not limited to – planned and participated in filming an interaction with him at the IMAX theatre in No-blesville and posting it to YouTube with the label "[the Target] is a pedo-phile."**[2]

[Dkts. 19-3 at 1; 26-7 at 1 (emphases in originals).]  The letter provided "**until this matter is re-solved, you are restricted from initiating any contact with [the Target] directly or indirectly including telephone, email, mail, and through friends or other persons at any time and place anywhere on or off the Ball State University campus.**"  [Dkts. 19-3 at 2; 26-7 at 2 (em-phases in originals).]

Ball State's investigation of the Target's complaint involved the following actions:

- On November 18, 2011, Dr. Gillilan met with the Students and their attorney. The Students admitted their roles in creating the fictitious "Ashley" Facebook page and creating the YouTube video, and also disclosed that Mr. Sumwalt had accepted the help of a fifteen year-old student at Southside High School to pose as "Ashley."  The Students also explained their issues with the Target as a prior roommate.  [Dkt. 26-1 at 3, ¶ 15.]

- On November 22, 2011 and December 2, 2011, Dr. Gillilan met with another Ball State student who was the videographer of the YouTube video.  He was charged with aiding and abetting the Students, and accepted responsibility for that charge.  [*Id.*]

---

[2] The letter also advised the Students that they were accused of violating a Conduct Code provision prohibiting stalking, [dkts. 19-3 at 1-2; 26-7 at 1-2], but that allegation ultimately was not pursued.

- On November 30, 2011, Dr. Gillilan spoke with Dr. Nagel, an instructor in the School of Music, who Mr. Sumwalt reported had knowledge of relevant events.  Dr. Nagel reported that the Target was "struggling with his composition."  [*Id.*]

Based on its investigation, the OSRCS charged the Students each with two Conduct Code violations: (1) harassment; and (2) invasion of privacy.  [*Id.* at 3, ¶ 16.]

Dr. Gillilan met with the Students to inform them of the charges against them, and they were given the opportunity to accept or deny responsibility for the Conduct Code violations.  [*Id.* at 3, ¶ 17.]  Both acknowledged and accepted responsibility by signing a December 2, 2011 document in which each checked the line reading "I accept responsibility for the violation indicated above" for both Harassment under Section 5.1.1 of the Conduct Code and Privacy Violation under Section 5.1.4 of the Conduct Code.  [Dkts. 19-4 at 1; 26-8 at 1.]  The letter they signed also provided that:

- "I understand that if I do not accept responsibility for any or all of the violations of the [Conduct Code] charged to me, I will be provided a full hearing before the University Review Board.  I understand further that I will be notified in writing of the date, time and location of the hearing as well as other information regarding my rights related to a hearing," [dkts. 19-4 at 1; 26-8 at 1]; and

- "If I have accepted responsibility for the [Conduct Code] violations charged to me, I understand that the University Review Board will review this statement, all other records related to this incident, and my prior conduct record in determining what sanctions (up to and including expulsion from the University) to recommend to the Director of Student Rights and Community Standards," [dkts. 19-4 at 1-2; 26-8 at 1-2].

On December 6, 2011, Dr. Gillilan wrote separately to the Students to inform them that based on their acknowledgment of responsibility for the Conduct Code violations, the University Review Board ("Review Board") would be meeting to determine and recommend appropriate sanctions.  [Dkts. 26-9; 26-10.]  The Review Board met on December 9, 2011, and considered an

OSRCS review summary prepared by Dr. Gillilan, [dkt. 26-11]; the Target's initial November 1, 2011 correspondence to Dr. Gillilan, [dkt. 26-6]; the student records of the Target and the Students; the December 2, 2011 written acknowledgments signed by the Students, [dkts. 19-4; 26-8]; a letter from the Students, [dkt. 26-12]; testimony and correspondence from character witnesses for the Students, [dkt. 26-13]; testimony and an impact statement provided by the Target, [dkt. 26-14]; testimony from one of the Target's parents; and screenshots of Facebook and YouTube postings and comments, [dkt. 26-16].  At the December 9, 2011 meeting, the Review Board recommended sanctioning the Students by suspending them for one year, until Spring Semester 2013, as well as "the imposition of certain reflection and action to raise awareness of fellow students regarding the responsible use of social media."  [Dkts. 26-1 at 5, ¶ 25; 26-17 at 5.]

Dr. Gillilan then met with the Review Board and requested that they "add [to the recommended sanctions] disciplinary probation upon return, continued restrictions against making contact with [the Target], and a meeting with [the] OSRCS prior to return."  [Dkt. 26-1 at 5, ¶ 25.] The requirement that the Students meet with the OSRCS prior to their return to Ball State and the imposition of disciplinary probation for a calendar year upon return are "routine and uniform requirements of all students suspended by [Ball State]."  [*Id.* at 5, ¶ 26.]  The requirement that the Students take part in activities to raise awareness of fellow students regarding the responsible use of social media "arose in part from the suggestion of [the Students]."  [*Id.* at 6, ¶ 27; *see also* dkts. 19-4 at 2; 26-8 at 2.]

On December 13, 2011, Dr. Gillilan sent letters to each of the Students, outlining the Review Board's recommended sanctions and his acceptance and imposition of those sanctions. [Dkts. 19-5; 26-18.]  The letters also advised the Students of disciplinary probation and other

conditions upon their return to Ball State, and discussed their right to appeal the sanctions im-

posed.  [*Id.*]

The Students both appealed the sanctions decision, stating that:

- They do not intend "to deny responsibility for the student codes that we have violated, and we intend to make amends for these violations.  However, we feel that the proposed sanctions are unnecessarily harsh and emphasize punishment rather than promoting rehabilitation and/or academic growth," and have attached a proposal for an alternative sanction, [dkt. 19-6 at 1];

- They wanted to "express our objections about the process of the investigation," including: (1) that, due to confusion regarding the meeting with the Review Board, they could not review the evidence prior to the meeting; (2) that during the meeting, the information provided to the Review Board was "one-sided and omitted crucial details that would incriminate [the Target] while simultaneously including irrelevant and misleading information that favored [the Target];" and (3) that their "honesty and cooperation throughout the investigation has not been taken into consideration."

[Dkt. 19-6 at 1-2.]

On December 23, 2011, Dr. Hargrave sent letters to each of the Students informing them

that he had reviewed their appeal letter and their disciplinary files, had given careful review to

the sanctions, and found "no grounds for appeal and am therefore upholding the sanction com-

municated to you by Dr. Gillilan."  [Dkts. 19-7; 26-19 at 3, ¶ 15.][3]

Based on the sanctions decision, the Students were not allowed to register for classes for

the Spring 2012, Summer 2012, or Fall 2012 semesters.  [Dkt. 19-2 at 3, ¶ 22.]  Mr. Zimmerman

also lost his job at Ball State's radio-television center.  [*Id.* at 3, ¶ 23.]  Mr. Zimmerman met with

Dr. Gillilan on November 9, 2012, in satisfaction of the condition precedent to Mr. Zimmer-

man's re-enrollment and return to Ball State for the Spring 2013 semester.  [Dkt. 26-1 at 6, ¶ 30.]

---

[3] While it does not appear that the letter sent to Mr. Sumwalt denying his appeal is part of the record, Mr. Sumwalt did not dispute the assertion contained in Dr. Hargrave's Affidavit that "Sumwalt was sent an identical letter," [dkt. 26-19 at 3, ¶ 15], in his Reply/Response brief, [dkt. 31 at 1-3].

He is now re-enrolled at Ball State and the only condition remaining in dispute is that, in order to graduate, he must "engage in a project indicating reflection and action to raise awareness of fellow students regarding the responsible use of social media." [*Id.*] [4] Mr. Sumwalt chose not to return to Ball State, enrolled at Butler University, and completed his undergraduate degree there. [*Id.* at 6, ¶ 31.] Accordingly, there are no matters still pending between Mr. Sumwalt and the OSRCS. [*Id.*]

### D.  The Lawsuit

On October 11, 2012, the Students filed a Complaint for Injunction and Other Equitable and Legal Relief against the Board of Trustees of Ball State, Dr. Gora, Dr. Hargrave, and Dr. Gillilan. [Dkt. 1.] They sue "pursuant to 42 U.S.C. § 1983" [*id.* at 1], and assert claims for First Amendment violations against Drs. Gillilan and Hargrave under color of state law, [*id.* at 6-7], First Amendment violations against Dr. Gora for "institutional liability," [*id.* at 7-8], due process violations against Drs. Gillilan and Hargrave, [*id.* at 8-9], and due process violations against Dr. Gora for "institutional liability," [*id.* at 9-10].  The Students seek: (1) a permanent injunction against Ball State and its administrators, faculty or staff, prohibiting Ball State from enforcing the Conduct Code with respect to off-campus conduct, or to conduct that does not occur at a Ball State hosted, sponsored or sanctioned event, or which does not involve the use of Ball State equipment or facilities; (2) an order requiring Ball State to "remove all references to this incident

---

[4] Mr. Zimmerman's Motion for Emergency Hearing on Preliminary Injunction, filed November 4, 2012, was based on his allegation that he was being denied re-enrollment to Ball State for the Spring 2013 semester.  [Dkt. 13.]  The only relief Mr. Zimmerman requests in the motion is that the Court "set[] an emergency hearing on the issue of a preliminary injunction at the earliest possible time."  [*Id.* at 2.]  After Mr. Zimmerman filed the motion, he had his November 9, 2012 meeting with Dr. Gillilan and was permitted to re-enroll at Ball State for the Spring 2013 semester.  [Dkt. 26-1 at 6, ¶ 30.]  Accordingly, the emergency nature of Mr. Zimmerman's motion was removed and the motion is now moot.  [*See also* Dkt. 31 at 16, n.12 (the Students stated "[t]he subsequent agreement of the parties to allow [Mr.] Zimmerman to enroll in classes for the Spring 2013 semester rendered [his] request for a preliminary injunction moot").]

from the Students' files"; (3) an order requiring Ball State to notify all Ball State students of the limitations on enforcement of the Conduct Code they have requested; (4) actual damages for Mr. Sumwalt, including the increased tuition he paid to attend Butler University for his final semester; (5) actual damages for Mr. Zimmerman, including lost wages; (6) compensatory damages for "emotional distress, embarrassment, humiliation and damage to [their] personal and academic reputation…"; (7) punitive damages; and (8) attorneys' fees and costs.  [*Id.* at 11.]

### III.
#### DISCUSSION

At the outset, the Court notes that several of the parties' arguments have morphed during the briefing of the cross-motions for summary judgment.  Indeed, as discussed more specifically below, at times the parties have drastically changed positions, they have abandoned arguments asserted in earlier briefs altogether, and/or they have ignored opponents' arguments.  By way of understatement, the Court's task in evaluating those motions was unnecessarily cumbersome.  In evaluating the arguments asserted, the Court is mindful of the principle, depicted below,[5] that once a party chooses to take a certain position, it "cannot change horses in midstream."  *Broaddus v. Shields*, 665 F.3d 846, 854 (7th Cir. 2011).



---

[5] This depiction is attributable to artist Richard Gunther.  *See* http://www.christart.com (last viewed April 11, 2013).

While the Court has tried its best to sort through the parties' legal arguments, to whatever extent their briefing strategy has caused the Court to overlook beneficial arguments, the Court deems those arguments waived either for lack of cogent development, for being inconsistent with positions previously taken, or for being raised for the first time on reply.

The cornerstone of the Students' claims is their argument that Ball State did not have the legal authority to regulate their conduct. Their first challenge claims their conduct could not be regulated because it took place off-campus.  They also assert that Ball State's actions in disciplining them for the sandwich prank and the events leading up to and culminating in the YouTube posting fall outside of the grant of authority to state-funded educational institutions provided by the Indiana General Assembly in Indiana Code § 21-39-2-3 because their actions were neither unlawful nor objectionable.  [Dkt. 19 at 8-19.]  They also argue that Ball State lacks authority to regulate their actions because they constituted expressive conduct protected by the First Amendment.  [*Id.* at 19-25; dkt. 31 at 24-34.]  Additionally, they argue that even if Ball State had the authority to apply the Conduct Code to off-campus behavior, their actions did not constitute Conduct Code violations.  [Dkt. 19 at 25-26.]   Based on their argument that Ball State lacked the authority to regulate their off-campus conduct, the Students argue that Defendants violated their right to due process by subjecting them to the disciplinary process in the first place. [Dkt. 31 at 21-24.]

Defendants argue in their cross-motion that the Conduct Code, and its application to the Students' actions, is within the authority granted to Ball State by the Indiana General Assembly, [dkts. 26 at 12-18; 34 at 4-8], and that the Students waived any objection to application of the Conduct Code by signing acknowledgments that they had violated the Conduct Code, [dkt. 34 at 8-10].  They also argue that any claims for money damages against the Board of Trustees, Dr.

Gora, Dr. Gillilan and Dr. Hargrave in their official capacities are barred by the doctrine of sovereign immunity, that there are no individual capacity claims asserted against Drs. Gillilan and Hargrave and that, even if there were, they are entitled to qualified immunity for those claims. [Dkts. 26 at 18-22, 38-40; 34 at 18-20.]  Finally, they assert that the Students received due process, and that they did not engage in protected speech.  [Dkts. 26 at 22-28; 34 at 11-14.]

### A.  Immunity

While the Seventh Circuit Court of Appeals has instructed that "[t]he ability of governments to waive the benefit of sovereign immunity demonstrates that the doctrine is non-jurisdictional," *Blagojevich v. Gates*, 519 F.3d 370, 371 (7th Cir. 2008), the Court will discuss the immunity issue first because the focus of the Students' case – whether Ball State had the authority to regulate their off-campus conduct – and almost every other issue raised in the pending motions are intertwined with the immunity issue.

### 1.  Sovereign Immunity and Official Capacity Claims

Defendants initially argue that any claims for monetary damages against them are barred by the Eleventh Amendment to the United States Constitution, because they are sued only in their official capacities, [dkt. 26 at 18-20].  The Students respond that they "do not contest Defendants' claim that the Eleventh Amendment bars individuals from obtaining money damages in a 42 U.S.C. § 1983 action with respect to an official capacity suit," but that Defendants "misstate[] the full nature of the relief [they] seek in this action, and the bases for those claims." [Dkt. 31 at 15.]  Specifically, the Students argue that they seek equitable relief (a permanent injunction against allegedly unlawful enforcement of the Conduct Code to off-campus conduct, and removal of "all references to this matter from [their] academic records," [*id.* at 16]), which

does not contravene the Eleventh Amendment.  The Students recrafted arguments specifically overlook the fact that they requested recovery of damages in their Complaint.

The Court finds that any claims for monetary damages against the Trustees, Dr. Gora, who is only sued in her official capacity, and Drs. Gillilan and Hargrave in their official capacities (to the extent those claims exist), are barred by the Eleventh Amendment.  *Council 31 of the Am. Fed'n of State, County & Mun. Emples. v. Quinn*, 680 F.3d 875, 881-82 (7th Cir. 2012). What remains for discussion are the Students' individual capacity claims against Drs. Gillilan and Hargrave (which, as discussed below, the Court finds the Students have adequately distinguished from official capacity claims), and their claims for equitable relief against all of the Defendants.

### 2.  Qualified Immunity and Individual Capacity Claims

Defendants argue that the Students have not adequately alleged claims against Drs. Gillian and Hargrave in their individual capacities because they do not allege they "took any action other than in the regular performance of their official duties, performed as a matter of duty," [Dkt. 26 at 20].  Defendants further argue that, to the extent there are individual capacity claims against Drs. Gillian and Hargrave, those claims fail because those individuals are entitled to qualified immunity.  [*Id.* at 38-40.]  The Students respond that they have properly alleged individual capacity claims against Drs. Gillilan and Hargrave because they have not alleged those individuals acted to carry out an official policy in connection with their individual claims.  [Dkt. 31 at 18.]  The Students also argue that Drs. Gillilan and Hargrave are not entitled to qualified immunity because case law "clearly establish[es] that the authority of school officials to regulate student speech is limited to those instances in which the speech occurs on campus, during school-sponsored event[s], or during an event approved by the school, or which otherwise poses

a threat of substantial disruption to the school's operations."  [*Id.* at 35.]  On reply, Defendants appear to abandon their argument that the Students have not alleged individual capacity claims against Drs. Gillilan and Hargrave, focusing instead on their assertion that those individuals enjoy qualified immunity because – as shown by the divided Supreme Court in *United States v. Alvarez*, __ U.S. __, 132 S.Ct. 2537 (2012), and the case law in existence when the events at issue took place – they "could not have had prior notice that imposing discipline for intentionally false Facebook postings intended to humiliate a fellow student could enjoy constitutional protection." [Dkt. 34 at 20.]

The Court finds, as the Defendants appear to concede by failing to address the Students' arguments, that the Students have adequately alleged individual capacity claims against Drs. Gillilan and Hargrave.  They allege that Drs. Gillilan and Hargrave acted under color of state law, and do not allege that their individual actions were simply to carry out an official policy or custom.  [Dkt. 1 at 6-9, ¶ ¶ 37-45, 52-63.]  This is sufficient to establish that the Students have alleged individual capacity claims against Drs. Gillilan and Hargrave.  *See, e.g., Miller v. Smith*, 220 F.3d 491, 494 (7th Cir. 2000) (stating "where the plaintiff alleges tortious conduct of an individual acting under color of state law, the defendant has been sued in her individual capacity," and finding that plaintiff alleged individual capacity claims where "at no time did he suggest that either [defendant] espoused a custom or policy of" engaging in the wrongdoing alleged).

The question then becomes whether Drs. Gillilan and Hargrave are entitled to qualified immunity in connection with those individual capacity claims.  In order to proceed against Drs. Gillilan and Hargrave in their individual capacities, the Students must: "(1) adequately allege the violation of a constitutional right, and (2) that right must be clearly established at the time of the

alleged violation, so that a reasonable public official would have known that his conduct was un-lawful." *Sonnleitner v. York*, 304 F.3d 704, 716 (7th Cir. 2002).

### a.  Violation of a Constitutional Right

The crux of this case is the Students' claim that Ball State did not have the authority to regulate their conduct under Indiana Code § 21-39-2-3.  Defendants argue that simply alleging that application of the Conduct Code to the Students' conduct exceeded the authority granted by § 21-39-2-3 does not allege a constitutional violation.  [Dkt. 26 at 18 ("Whether the [Conduct Code], or its application here to discipline the students, strictly complies with state law does not, in and of itself, state a claim for a violation of federal due process….Similarly, whether or not a college's rules are followed to the letter or largely ignored in a disciplinary charging decision or adjudicatory process in higher education carries little weight with regard to a First Amendment claim").]  The Students do not respond to this argument.

The Students do not tether their argument that Defendants' regulation of their conduct fell outside the authority granted by Indiana Code § 21-39-2-3 to any specific constitutional pro-vision, and have cited no authority for the proposition that if something is contrary to state law, it is automatically a constitutional violation.  In sifting through the Students' ever-changing and often unsupported arguments, the Court has struggled the most with determining the precise con-tours of this purported constitutional claim.  As best as it can discern, the Court concludes that the Students assert that Defendants violated their substantive due process rights by regulating their conduct allegedly outside of the authority granted by § 21-39-2-3.  They argue that Defend-ants exceeded that authority in two ways: (1) because their conduct took place off-campus; and (2) because their conduct was not unlawful or objectionable.  [*See* dkt. 19 at 8-19.]  Without ac-cepting the necessary premise of the Students' claim – that acting contrary to state law consti-

tutes a constitutional violation – the Court, out of an abundance of caution, will consider whether Defendants did, indeed, act outside the authority provided by Section 21-39-2-3.[6]  Additionally, the Court will consider whether that conduct could support the Students' procedural due process or First Amendment claims.

### i.    *Due Process Violations*

#### a.  *Procedural Due Process*

The Students specifically disavow any procedural due process claim they may have in their reply brief, stating that Defendants "misunderstand[] the actual nature of [their] due process claims, which are not predicated on the *manner* in which the [Conduct Code] was applied to their case, but rather, that the [Conduct Code] was *applied to their case at all*, since such an application exceeded Ball State's legislatively granted authority."  [Dkt. 31 at 19 (emphases in original).]  While they do argue that they were "forced" to sign the acknowledgments of Conduct Code violations[7] and that "whether the Students' discipline was carried out in conformity with the [Conduct Code] is a disputed issue," [*id.* at 21], they do not point to any specific problems with the disciplinary process – choosing to focus instead on the simple fact that they were sub-

---

[6] Defendants recognize the faulty premise behind the Students' claim related to exceeding the authority of § 21-39-2-3, [dkt. 26 at 18], and suggest that the Conduct Code is essentially a contract between Ball State and its students such that any claim the Students have regarding its enforcement would be a state law contract claim, [*id.* at 10].  But there is no state law contract claim asserted in the Complaint, nor any reference to such a claim by the Students in their briefs.

[7] Other than their conclusory opinion, the Students do not provide any evidence demonstrating that signing the acknowledgments was anything but voluntary.  To the contrary, the Students were represented by an attorney throughout the disciplinary process, [*see, e.g.*, dkt. 26-1 at 3, ¶ 15], and were competent adults when they signed the acknowledgments.  Additionally, in any event, the Students appear to concede that the issue is irrelevant.  [Dkt. 31 at 21, n.16 ("Ultimately, however, the issue of whether the 'plea agreements' were signed voluntarily is beside the point.  The real coercion occurred when the Students were forced to submit to Ball State's disciplinary process based on unlawful, off-campus conduct over which Ball State had no authority").]

jected to that process in the first place.  As discussed above, the only constitutional protection the Court can plausibly tie to the Students' argument regarding Defendants' lack of authority to regulate their conduct is substantive due process, which is addressed below.  The Students have not asserted a viable procedural due process claim.  *See Dunn v. Fairfield Community High Sch. Dist. No. 255*, 158 F.3d 962, 964 (7th Cir. 2005) (noting plaintiff's challenge to school's authority to discipline them was not a procedural due process claim, but rather a substantive due process claim, and stating "[t]he fundamental flaw in [plaintiff's] theory of the case arises from their failure to appreciate the difference between the procedural protections afforded by the Fourteenth Amendment…and the far more limited substantive standards that Amendment imposes on state actors"); *see also Hartman v. Keri*, 883 N.E.2d 774, 778-79 (Ind. 2008) (Indiana Code § § 21-39-2-2 to -3 gives state higher educational institutions "the power to 'dismiss, suspend, or otherwise punish any student, faculty member, or employee of the state educational institution who violates the institution's rules or standards of conduct, after determination of guilt by lawful proceedings.'…These statutes authorize educational institutions to construct their own disciplinary procedures in a way that protects the needs of the participants and also serves the educational goals of the institution.  Although Purdue's procedure may lack the trappings of a traditional court proceeding, it is orderly and reasonably fair, requires 'appropriate discipline' for those who file knowingly false or malicious complaints, and promises reasonable efforts to restore the reputation of anyone charged with discrimination or harassment that proves unsubstantiated").

If the Court is incorrect in determining the Students are not asserting a procedural due process claim, their lack of cogent argument waives such a claim, and in any event the undisputed facts establish the requisite notice and opportunity to be heard.  Defendants are entitled to judgment on this issue.

b.   *Substantive Due Process*

As for substantive due process, the ability to invoke such protection is very limited.  *Lee v. City of Chicago*, 330 F.3d 456, 467 (7th Cir. 2003).  "The essence of due process is the 'protection of the individual against arbitrary action of government.'"  *Tun v. Whitticker*, 398 F.3d 899, 902 (7th Cir. 2005) (*quoting Wolff v. McDonnell*, 418 U.S. 539, 558 (1974)).  In order to succeed, the Students must show that Defendants exercised their power "without any reasonable justification," and engaged in "an abuse of power that 'shocks the conscience.'"  *Dunn*, 158 F.3d at 965.

In *Dunn*, two students were given Fs in band class after playing unauthorized solos during a band performance at an athletic event.  The students there asserted a substantive due process claim based on the school's entire disciplinary classifications and penalty structure.  *Id.* ("Although the briefs are not entirely clear on this point, we understand from oral argument the [plaintiffs] are also asserting a legislative violation of substantive due process rights, insofar as they are attacking [the school's] written disciplinary classifications and penalty structure").  The Seventh Circuit Court of Appeals held that the school policy at issue "comes nowhere close to a constitutional violation," finding that "education itself is not a fundamental right," and that the decision to "stack the deck so that these students would fail Band must be sustained unless it is wholly arbitrary."  *Id.* at 966.  The court noted that – as here – the students "freely conceded that they had violated a school rule," and that "the rule was designed to preserve discipline in the classroom and to punish student insubordination, and that these were legitimate interests on the part of the school district."  *Id.*

Even assuming the Students had some property right in their education at Ball State, they do not allege that Defendants acted in such a way as to shock the conscience.  And even if acting

outside the scope of Indiana Code § 21-39-2-3 were enough – without more – to shock the conscience, which the Court does not find to be the case, the Court finds in any event that Defendants' exercise of authority fell well within the parameters of Indiana Code § 21-39-2-3 and, thus, could not have shocked the conscience.  The Students first assert that Ball State had no authority to regulate their off-campus behavior.  They also assert that the statute limits Ball State's authority to regulate off-campus student conduct to "the prevention of *unlawful* or *objectionable* acts, and then only if the acts 'seriously threaten the ability of the state educational institution to maintain the state educational institution's facilities[,]'or 'violate the reasonable rules and standards of the state educational institution designed to protect the academic community from unlawful conduct or conduct presenting a serious threat to person or property of the academic community.'"  [Dkt. 19 at 9 (emphasis in original).]  They assert that neither the sandwich prank nor the events leading up to and culminating in the YouTube posting were unlawful or objectionable and that, even if they were objectionable, they did not seriously threaten the ability of Ball State to maintain its facilities.  [*Id.* at 10-19.]

Indiana Code § 21-39-2-3 gives state universities the authority to:

[G]overn, by lawful means, the conduct of the state educational institution's students…wherever the conduct might occur, to prevent unlawful or objectionable acts that:

(1) seriously threaten the ability of the state educational institution to maintain the state educational institution's facilities; or

(2) violate the reasonable rules and standards of the state educational institution designed to protect the academic community from unlawful conduct or conduct presenting a serious threat to person or property of the academic community.

### 1.  Off-Campus Acts

The Students attempt to draw a distinction between the regulation of on-campus versus off-campus student activity, arguing that Indiana Code § 21-39-2-3 provides "significantly more

limited authority to regulate *off-campus* behavior" than on-campus behavior.  [Dkt. 19 at 9-10 (emphasis in original).]  The Students ignore the statute's clear grant of authority to regulate certain conduct "*wherever* the conduct might occur" – in other words, whether it is on- or off-campus.  Ind. Code § 21-39-2-3 (emphasis added).  The Court finds that the location of the misconduct is irrelevant, so long as the conduct meets the criteria of § 21-39-2-3 discussed below.

### 2.   Objectionable Acts[8]

At the outset, the Court notes that the Students radically changed their position during briefing of the summary judgment motions regarding the grant of authority to Ball State under Indiana Code § 21-39-2-3.  They initially argued that "Ball State's authority to regulate the *off-campus* actions of its students must meet two very specific criteria: first, the behavior the University seeks to regulate must be an act that is either 'unlawful' or 'objectionable;'…," [dkt. 19 at 10 (emphasis in original)], and spent several pages of their opening brief arguing that their actions were not objectionable, [*id.* at 16-19].  In their response/reply brief, they inexplicably change their argument and assert for the first time that Ball State can only regulate unlawful off-campus activity, not objectionable activity.  [*See* dkt. 31 at 7 (arguing that because the State of Indiana can only regulate conduct that is unlawful, not just objectionable, it cannot grant to Ball State the authority to regulate objectionable conduct that is not unlawful).]

The Students chose their strategy in support of their summary judgment motion, and are bound by that choice in their response/reply.  *See Econ. Folding Box Corp. v. Anchor Frozen Foods Corp.*, 515 F.3d 718, 721 (7th Cir. 2008) (finding argument raised for the first time on appeal to be waived because the party must "accept the consequences of [its] decision" to present

---

[8] The Court finds it unnecessary to determine whether the Students acted unlawfully in carrying out the sandwich prank or in connection with the events leading up to and culminating in the making and posting of the YouTube video because, as discussed below, it finds that those actions were objectionable within the meaning of Indiana Code § 21-39-2-3.

its claims under one legal theory instead of another); *Griffin v. Bell*, 694 F.3d 817, 822 (7th Cir. 2012) ("[A]rguments raised for the first time in a reply brief are deemed waived").  The Court finds that the Students have waived any argument that Ball State can only regulate off-campus activity that is unlawful, and not such activity that is merely objectionable.

In any event, despite the waiver issue, the Students' newly-asserted reading of Indiana Code § 21-39-2-3 is wrong.  Under Indiana law – which this Court must follow in interpreting a state statute, *Util. Trailers of Indianapolis, Inc. v. Util. Trailer Mfg. Co.*, 2013 U.S. Dist. LEXIS 36721, *7-8 (S.D. Ind. 2013) – a court "will not engage in statutory interpretation unless the language of the statute is ambiguous," *Brownsburg Area Patrons Affecting Change v. Baldwin*, 137 F.3d 503, 508 (7th Cir. 1998).  Where a statute is unambiguous, "the court will give effect to the plain, ordinary, and usual meaning of the language of the statute." *Id.*  There is nothing ambiguous about the plain language of the statute, which allows Ball State to "prevent unlawful *or* objectionable acts…" "*wherever* the conduct might occur."  Ind. Code 21-39-2-3 (emphasis added).  The statute does not require that regulated off-campus acts be unlawful in addition to being objectionable.  *See Hartman*, 883 N.E.2d at 778-79 (Ind. 2008) ("[T]he Indiana General Assembly has given state higher educational institutions the power…to 'prevent unlawful or objectionable acts,' of the institution's students, faculty, and employees 'wherever the conduct might occur'").  Accordingly, the Court will analyze whether the sandwich prank and the actions surrounding the YouTube video were objectionable.[9]

---

[9] The Court also rejects the Students' argument that the Defendants cannot regulate conduct that is simply objectionable because the State can only discipline citizens for unlawful conduct.  First, the Students raise this argument for the first time on reply and it contradicts their initial position that Defendants can regulate certain objectionable conduct even when it is not also unlawful.  Second, the Students cite no legal authority to support their argument, and the Court has not located any.

The Court will give the word "objectionable" as used in Section 21-39-2-3 its plain, ordi-nary, and usual meaning.  *Brownsburg Area Patrons Affecting Change*, 137 F.3d at 508.  Merri-am-Webster's Dictionary defines "objectionable" as "undesirable [or] offensive." http://www.merriam-webster.com/dictionary/objectionable (last viewed April 11, 2013).  In con-nection with the sandwich prank, the Students simply argue that "while [the sandwich prank] might be labeled as 'irksome,' 'annoying,' 'irritating,' or even 'mean,' it strains credulity to ar-gue that the actions were 'objectionable' in any objective sense."  [Dkt. 19 at 17.]  To the contra-ry, the Court finds that no reasonable juror could find that the Students' conduct in leaving a sandwich in the Target's bedroom with the purpose of letting it rot, while also locking his bed-room door to prevent him from entering the bedroom upon his return, was not "objectionable."[10] *See Blood v. VH-1 Music First*, 668 F.3d 543, 548-49 (7th Cir. 2012) (affirming district court's grant of summary judgment for defendants where a reasonable juror could not have concluded that plaintiff's claims succeeded).

As for the events leading up to and culminating in the making and posting of the YouTube video, despite the Students' characterization otherwise, the Court does not view the issue of whether these events were objectionable as a "close call" – they were.  Indeed, the type of scheme the Students designed and carried out was featured in a 2010 movie called *Catfish*, and has become the subject of a reality television show with the same name which airs on

---

[10] The Students argue that "[g]iven that the word 'objectionable' is used in conjunction with the word 'unlawful,' it is clear that Ind. Code 21-39-2-3(2) should be interpreted to mean 'objection-able' in the sense of actionable or tortious conduct, rather than merely annoying."  [Dkt. 19 at 17.]  The Students cite no authority for their interpretation of "objectionable," and the Court de-clines to read into the statute a requirement that conduct be "actionable" or "tortious" in order to qualify as "objectionable."

MTV.[11]  "Catfishing" is a term used to describe "[t]he phenomenon of internet predators that fabricate online identities and entire social circles to trick people into emotional/romantic relationships (over a long period of time)."  http://www.urbandictionary.com (last viewed April 11, 2013).  A "catfishing" incident involving a popular college football player has also garnered extensive media attention in recent months.  *See Manti Te-o hoax: Where did the 'catfish' come from?*, Chicago Tribune, January 17, 2013 (noting that "catfishing" may cause viewers to "lose that connection to it being a real event that left people feeling violated and hurt").

The Students took their "catfishing" scheme a step further – videotaping the Target's reaction when he found out that "Ashley" did not exist, and posting the video on YouTube with the caption "[the Target] is a pedophile."  The Court fails to see how their actions could *not* be considered objectionable.[12]  Further, it appears from the sequence of events that at least part of the Students' goal was to "trap" the Target into facing criminal consequences for communicating with someone they wanted him to think was an underage female.  Even throughout the disciplinary process, the Students were encouraging Ball State to investigate the Target for criminal behavior, going so far as to state that the Target "has committed a felony of child solicitation…," and to assert that "[w]e are concerned that the persons involved seem to be expressing indiffer-

---

[11] Reality television shows such as *Catfish* have been characterized as "[j]ust like a freeway car accident or train wreck," that "seem to exploit and reward outrageous behavior" and allow viewers to "'tak[e] delight in the problems and misfortunes of others.'" http://www.psychologytoday.com/blog/food-thought/201301/tantalized-train-wreck-reality-tele - vision (last viewed April 11, 2013).  Indeed, the very objectionable or offensive nature of the show's subject-matter can make it a hit.

[12] The Students argue that the Target was "a willing participant" in the Facebook communications, so they cannot be considered objectionable.  [Dkt. 19 at 17-18.]  But the Target did not know that the Facebook communications were fake, and, in any event, those communications were just part of the larger scheme to create the video and post it on YouTube.  It is beyond dispute that the Target was not "a willing participant" at that point in the scheme.

ence to criminal behavior and sheltering the accused." [Dkt. 19-6 at 2.][13]  The Court finds that no reasonable jury could conclude that the Students' entire scheme, culminating in videotaping the Target at the movie theater and posting the video on YouTube, was not objectionable.

> 3. *Threat to Ability of Ball State to Maintain Facilities or Violation of Reasonable Rules and Standards of Ball State*

Having found that the actions for which the Students were disciplined were objectionable, the Court considers whether they also either: "(1) seriously threaten the ability of the state educational institution to maintain the state educational institution's facilities; or (2) violate the reasonable rules and standards of the state educational institution designed to protect the academic community from unlawful conduct or conduct presenting a serious threat to person or property of the academic community."  Ind. Code § 21-39-2-3.  In another example of disjointed briefing, the Students only address the first prong, arguing that their actions did not seriously threaten the ability of Ball State to maintain its facilities.  [Dkt. 19 at 18-19.]  Later in their opening brief, they argue that their conduct did not violate the Conduct Code, but not in connection with Indiana Code § 21-39-2-3.  [*Id.* at 25-26.]  They simply make a more general argument that the videotaping had to have taken place at a location where the Target had some expectation of privacy, and he did not have that expectation at the movie theatre.[14]  [*Id.*]  Defendants then only quote the

---

[13] The Court finds Ball State's treatment of these accusations against the Target wholly irrelevant to its handling of the allegations against the Students, and will not consider or discuss it here.  In any event, the evidence indicates that the Target did not believe "Ashley" was underage.  [Dkt. 26-6 at 1.]

[14] The Court rejects this argument, which attempts to parse the language of the Conduct Code by arguing that the "image or recording" itself must cause injury or distress to a reasonable person, and that there is no evidence in the record to suggest their conduct meets this standard.  [Dkt. 19 at 25.]  As discussed above, the Court concludes that the conduct up to and including the recording and posting of the YouTube video was objectionable.  For purposes of the Conduct Code provision applying to a privacy violation, it also concludes that the actions were "likely to cause injury or distress as determined by a reasonable person."  [Dkt. 26-2 at 11.]

second prong in their argument, asserting that the Students did violate the Conduct Code.  [Dkt. 26 at 13-15.]  In their reply, the Students only address the first prong and argue that even if Ball State had the authority to regulate lawful but objectionable conduct, that authority is limited to conduct that is a serious threat to "person or property of the academic community."  [Dkt. 31 at 13.]  They do not address whether their conduct violated the Conduct Code.  Because Defendants do not appear to claim that the Students' actions threatened Ball State's ability to maintain its facilities, the Court will only consider whether those actions violated the Conduct Code, and also whether the Conduct Code provisions were "designed to protect the academic community from unlawful conduct or conduct presenting a serious threat to person or property of the academic community."  If so, then Ball State's authority to discipline the Students as it did here falls within Indiana Code § 21-39-2-3.

Tellingly, the Students both acknowledged that they violated the Conduct Code when they signed the December 2, 2011 letters.  [Dkts. 19-4; 26-8.]  The letters set forth which Conduct Code provisions they were accused of violating, and the Students both checked spaces indicating "I accept responsibility for the violation indicated above."  [*Id.*]  The Students also provided suggestions of activities they should be required to complete as sanctions, short of suspension or expulsion.  [*Id.*]  In their appeal letter, they stated "[o]ur intention is not to deny responsibility for the student codes that we have violated, and we intend to make amends for these violations," and again proposed sanctions alternative to suspension or expulsion.  [Dkt. 19-6.]

The Students argue that their acknowledgment of wrongdoing is irrelevant, given that "Ball State had no authority to discipline [them] to begin with…[and] that [they] should never have been confronted with the demand to 'accept responsibility' for their actions in the first place."  [Dkt. 31 at 11.]  This argument is a non-starter.  Their acknowledgment of wrongdoing

goes directly to whether they violated the Conduct Code, which is relevant in determining whether disciplining them for the conduct was within Ball State's authority in the first place.[15]

While the Students attempt to characterize their case as a challenge to Ball State's authority to regulate their off-campus conduct, the facts indicate that they did not have an issue with that authority – and in fact impliedly agreed with it by acknowledging they violated the Conduct Code and suggesting possible sanctions – until Ball State determined to expel them.[16]  Thus, their real complaint appears to be with the level of sanctions they received.[17]  They cannot now complain that Ball State had no authority to discipline them when they agreed that they violated the Conduct Code.  *See Dunn*, 158 F.3d at 966 ("[The students] freely conceded that they had violated a school rule, that the rule was designed to preserve discipline in the classroom and to punish student insubordination, and that these were legitimate interests on the part of the school district.  That alone is enough to show that their claim cannot possibly succeed").

Additionally, the Conduct Code provisions the Students violated were "designed to protect the academic community from unlawful conduct or conduct presenting a serious threat to person or property of the academic community."  Ind. Code § 21-39-2-3.  The Target was a

---

[15] The Defendant have analogized the Students' acknowledgments of responsibility to guilty pleas, which have the legal consequence of waiving objections to the underlying conviction.  [*See* dkt. 26 at 15.]  The Students object to this characterization, and maintain they were "forced" to accept responsibility to raise a fact issue.  While the Court rejects the guilty plea analogy, it also rejects the Students' claim of coercion.  The Court finds a more appropriate analogy to be an affidavit that contradicts earlier testimony, which cannot be used to create an issue of fact precluding summary judgment.  *See, e.g.*, *Harmon v. Gordon*, 2013 U.S. App. LEXIS 5555, * 15 (7th Cir. 2013).  Having accepted responsibility in writing, the Students cannot now claim coercion.

[16] The Court also finds ironic the Students' assertion that requiring them to engage in "reflection and action meant to raise awareness of [their] fellow students," was really to "instill in [the Students] a politically-correct attitude."  [Dkt. 10 at 2, n.1.]  In fact, it was the Students themselves who suggested this component of their punishment.  [Dkts. 19-4 at 2; 26-8 at 2.]

[17] The Students did not, however, sue the Review Board, which is the entity that recommended those sanctions.  [Dkts. 26-1 at 5, ¶ 25; 26-17 at 5.]

member of the Ball State community, and the Students' conduct presented a serious threat to his well-being, as evidenced by the Target's statements that he was a "nervous wreck," that he was "having trouble sleeping at night," and that he was "worried about what type of bullying [he] may be a victim of next." [*Id.* at 2.] The Target also stated that a medical provider gave him a prescription for Zoloft to "help [him cope] with this situation," and that the situation "has become extremely hindering to [his] progress in complet[ing] his degree." [*Id.*] The Conduct Code's provisions the Students violated were reasonably tailored to protect members of the Ball State community from the very type of behavior the Students exhibited.

The Court concludes that Ball State had the authority to regulate the Students' conduct in this case under Indiana Code § 21-39-2-3 because it was objectionable and it violated the Conduct Code's provisions, which were designed to protect the academic community from conduct presenting a serious threat to members of that community. Accordingly, the Court cannot conclude that Drs. Gillilan and Hargrave somehow acted egregiously or so as to shock the conscience by following the disciplinary procedure outlined in the Conduct Code, so their substantive due process claim fails. *See Remer v. Burlington Area Sch. Dist.*, 286 F.3d 1007, 1013 (7th Cir. 2002) (finding no substantive due process violation where ample evidence supported school's decision to expel student).

### ii.      *Expressive Conduct Protected by the First Amendment*

The Students also allege that Defendants violated their constitutional rights because both the sandwich prank and the events leading up to and including the recording and posting of the YouTube video are expressive conduct protected by the First Amendment. [Dkt. 19 at 20-25.] Specifically, they argue that "conduct sufficiently imbued with elements of communication falls within the scope of the First and Fourteenth Amendments," that the sandwich prank was de-

- 29 -

signed to "express their dissatisfaction and frustration with [the Target's] behavior, and, thereby encourage [the Target] to change his behavior," that the Facebook page and on-line contact with the Target through "Ashley" were "clearly communication," and that by videotaping at the movie theatre and posting the video on YouTube they "intended that others on the Ball State campus who knew [the Target], as well as [the Target] himself, would see the video, and that [the Target] would thereby be publicly embarrassed."  [*Id.*]

Defendants argue that merely intending to express an idea does not necessarily turn conduct into speech, and that neither the sandwich prank nor the events leading up to and culminating in the YouTube posting were, in fact, protected expressive conduct.  [Dkt. 26 at 28-32.]  Defendants also argue that the fictitious communications the Students engaged in cannot be protected speech because they were false.  [*Id.* at 33-34.]

In yet another "change of horses," the Students argue on reply that "[t]he Students' MSJ Brief argued that the 'sandwich prank' and the YouTube video were protected speech because they were 'imbued with elements of communication[;]…[s]ince filing the brief, further research and reflection has persuaded the Students' [sic] that, while maintaining that the actions are indeed protected speech, that is not the real issue."  [dkt. 31 at 24.]  They then go on to reiterate their main argument that Ball State had no authority to discipline them for their conduct in the first place, but then also argue that creating the Facebook page and posting fictitious information on that page were protected speech.  They do not address Defendants' arguments that creating the video and posting it to YouTube were not protected speech, even though they had originally asserted that they were.

Based on the parties' briefing of this issue, as best as the Court can discern, it appears that the Students have limited their First Amendment claim to their assertion that the creation of

the Facebook page and the postings on that page are protected speech.  They appear to have abandoned their arguments that either the sandwich prank, or the creation and posting of the YouTube video are protected speech, given their statement regarding "further research and reflection," and their failure to address Defendants' arguments on those points.  Accordingly, the Court will only address whether the creation of the Facebook page and the postings on that page were protected speech – all of the Students' other, original arguments regarding protected speech have been waived.

There is a disconnect with the Students' argument that the creation of the Facebook page and the fictitious postings constitute protected speech:  even if they do, they are just part of what the Students were disciplined for.  This re-tooled argument ignores the fact that videotaping the Target and posting that video to YouTube were large components of the overall scheme that violated the Conduct Code.  If that is not protected speech, as the Students appear to concede, then that conduct was not entitled to constitutional protection.  In any event, the Court concludes that creation of the Facebook page and the fictitious postings, assuming they were "speech" at all, were not protected speech.

The Students rely upon *United States v. Alvarez*, __ U.S. __, 132 S. Ct. 2537 (2012), for the proposition that just because speech is false, it is not "categorically excluded from First Amendment protection."  [Dkt. 31 at 27.]  Defendants argue that *Alvarez* did not change prior precedent denying First Amendment protection to certain kinds of false speech, including false speech that "involved 'some other legally cognizable harm associated with a false statement, such as an invasion of privacy….'"  [Dkt. 34 at 16.]

*Alvarez* involved a constitutional challenge to the Stolen Valor Act, 18 U.S.C. §§ 704(b) and (c), which "makes it a crime to falsely claim receipt of military decorations or medals and

provides an enhanced penalty if the Congressional Medal of Honor is involved." *Alvarez*, 132 S.

Ct. at 2539.  The Supreme Court struck down the Stolen Valor Act, holding that simply because

speech is false does not mean that it cannot enjoy First Amendment protection, but also keeping

in place previous precedent holding that certain types of false speech are not protected.  The Su-

preme Court stated:

> [C]ontent-based restrictions on speech have been permitted, as a general matter,
> only when confined to the few "historic and traditional categories [of expression]
> long familiar to the bar,"….Among these categories are advocacy intended, and
> likely, to incite imminent lawless action…; obscenity…; defamation…; speech in-
> tegral to criminal conduct…; so-called "fighting words"…; child pornography…;
> fraud…; true threats…; and speech presenting some grave and imminent threat
> the government has the power to prevent….Absent from those few categories
> where the law allows content-based regulation of speech is any general exception
> to the First Amendment for false statements.  This comports with the common
> understanding that some false statements are inevitable if there is to be an open
> and vigorous expression of views in public and private conversation, expression
> the First Amendment seeks to guarantee.

*Id.* at 2544.

The Supreme Court went on to distinguish cases involving false speech plus "some other

legally cognizable harm associated with a false statement, such as an invasion of privacy or the

costs of vexatious litigation….In those decisions the falsity of the speech at issue was not irrele-

vant to our analysis, but neither was it determinative.  The Court has never endorsed the categor-

ical rule the Government advances: that false statements receive no First Amendment protection.

Our prior decisions have not confronted a measure, like the Stolen Valor Act, that targets falsity

and nothing more."  *Id.* at 2545.  The Supreme Court also noted that "[e]ven when considering

some instances of defamation and fraud, moreover, the Court has been careful to instruct that

falsity alone may not suffice to bring the speech outside the First Amendment.  The statement

must be a knowing or reckless falsehood."  *Id.*

Accordingly, *Alvarez* stands for the proposition that just because speech is false does not mean it is not entitled to constitutional protection.  It does not stand for the proposition that all false speech *is* entitled to constitutional protection.  Here, the creation of the Facebook page and the posting of fictitious messages on that page are much more than just false.  First, the Students knew the communications were false; indeed, their falsity was the whole reason they were created – so that the Target would believe the communications and engage in a relationship with "Ashley."  Second, the communications were part of a larger scheme to trick the Target into engaging in a relationship with "Ashley," and ultimately entrap him into committing a crime by soliciting a minor.  It appears to the Court that these communications fall within the type which do not enjoy constitutional protection, not merely because they were false, but because they were made knowingly and in furtherance of a scheme to inflict emotional harm on the Target.  Their falsity is "not irrelevant to [the Court's] analysis, but neither [is] it determinative." *Id.* at 2545.

In any event, the Court need not make that determination because, as discussed below, even if the creation of the Facebook page and posting communications on that page were protected under the First Amendment, and even if the Students' failure to establish that the sandwich prank and creation and posting of the YouTube video are protected speech was not fatal to their First Amendment claims, Drs. Gillilan and Hargrave still enjoy qualified immunity because the Students' right to protection for that speech was not "clearly established at the time of the alleged violation, so that a reasonable public official would have known that his conduct was unlawful." *Sonnleitner*, 304 F.3d at 716.

### b.  Constitutional Right Clearly Established At the Time of the Alleged Violation

The Court has rejected the Students' claim that their constitutional due process rights were violated because Ball State's application of the Conduct Code to their off-campus conduct

exceeded the school's authority.  The Court struggled mightily to discern the constitutional underpinning of such a claim, and concludes Drs. Gilliland and Hargrave are entitled to qualified immunity as to such claim as it is anything but clearly established.

With respect to the First Amendment claim, the Students' claims fare no better  Even assuming that creating the Facebook page and posting communications on that page constituted speech protected by the First Amendment,  the status of that speech as protected was not clearly established when the Students were disciplined.

The *Alvarez* decision itself, which the Students rely upon for their argument that the creation of the Facebook page and postings on that page are protected speech, establishes the previous uncertainty surrounding the issue of whether false speech is protected by the First Amendment.  *See Alvarez*, 132 S. Ct. at 2553 (Justice Breyer, concurring, stated "I must concede, as the Government points out, that this Court has frequently said or implied that false factual statements enjoy little First Amendment protection") and 2557 (Justice Alito, dissenting, stated "[b]y holding that the First Amendment nevertheless shields these lies, the Court breaks sharply from a long line of cases recognizing that the right to free speech does not protect false factual statements that inflict real harm and serve no legitimate interest").  *Alvarez* was decided in June 2012, which was six months after the Students' appeal of Ball State's disciplinary decision was denied.  If the Supreme Court noted uncertainty in June 2012 regarding whether false speech enjoys constitutional protection, then the Students' right to have creation of the Facebook page and postings on that page protected was not "clearly established" when the Students were disciplined, and Drs. Gillilan and Hargrave certainly could not have known that they could have been acting unconstitutionally by regulating that speech.  Accordingly, Drs. Gillilan and Hargrave are entitled

to qualified immunity even if creation of the Facebook page and postings on that page were considered protected speech.

In sum, the Students' official capacity claims for monetary damages against all Defendants are barred by the Eleventh Amendment's grant of sovereign immunity, and any individual capacity claims for monetary damages against Drs. Gillilan and Hargrave are barred by the doctrine of qualified immunity.

### B.  Injunctive Relief

The Students seek various types of injunctive relief, including: (1) a permanent injunction against Ball State and its administrators, faculty or staff prohibiting Ball State from enforcing the Conduct Code with respect to off-campus conduct; (2) an order requiring Ball State to remove all references to "this incident" from the Students' files;[18] and (3) an order requiring Ball State to notify all of its students that it cannot enforce the Conduct Code with respect to off-campus conduct.[19]  [Dkt. 1 at 11, ¶¶ A-C.]  The Court's finding that the Students' claims fail on the merits is fatal to their claims for injunctive relief, since they cannot meet a threshold requirement for injunctive relief – success on the merits.  *See Planned Parenthood of Ind., Inc. v.  Comm'r of the Ind. State Dep't of Health*, 699 F.3d 962, 972 (7th Cir. 2012) (party seeking injunctive relief must demonstrate: (1) a reasonable likelihood of success on the merits; (2) that he does not have an adequate remedy at law; and (3) that he will suffer irreparable harm absent the injunction).

---

[18] The Court sees some irony in the Students' request that all references to this "incident" be removed from their academic record.  The Students have made the details of the "incident" public by filing this lawsuit, so any interest they may assert in keeping the details private is questionable.

[19] The scope of injunctive relief the Students seek with regard to prohibiting Ball State from regulating the off-campus conduct of all Ball State students and requiring Ball State to notify those students that it cannot regulate their off-campus conduct far exceeds any remedy they, as individuals, would be entitled to.  This is not a class action, and the Students have presented no authority suggesting that they are somehow entitled to seek relief on behalf of all Ball State students.

Accordingly, Defendants are entitled to summary judgment on the Students' claims for injunctive relief.[20]

## IV.
### CONCLUSION

For the foregoing reasons, the Court **GRANTS** the Cross-Motion for Summary Judgment filed by the Board of Trustees of Ball State and Drs. Gora, Hargrave, and Gillian, [dkt. 25], **DENIES** the Motion for Summary Judgment filed by the Students, [dkt. 18], and **DENIES AS MOOT** Mr. Zimmerman's Motion for Emergency Hearing on Preliminary Injunction, [dkt. 13]. Judgment will enter accordingly.

04/15/2013

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

---

[20] The Court is mindful of the Seventh Circuit Court of Appeals' preference that "[w]here…a district court decides that a party moving for a preliminary injunction has not satisfied one of the threshold requirements, we have encouraged the court to conduct at least a cursory examination of all the aforementioned preliminary injunction considerations." *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States of America Inc.*, 549 F.3d 1079, 1087 (7th Cir. 2008). Here, however, the Court has made a dispositive ruling on the merits, rather than a factual finding that a requirement for injunctive relief is missing. *Cf. id.* (noting that district court denied injunctive relief based solely on finding that plaintiff failed to meet threshold burden of demonstrating that it would suffer irreparable harm absent an injunction). Accordingly, no discussion of the other requirements for injunctive relief is necessary since the Court has concluded that the Students cannot succeed on the merits as a matter of law.

**<u>Distribution via ECF only</u>:**

Matthew L. Kelsey
DEFUR VORAN LLP
mkelsey@defur.com

Jay Meisenhelder
EMPLOYMENT AND CIVIL RIGHTS LEGAL SERVICES
jaymeisenhelder@gmail.com

Scott E. Shockley
DEFUR VORAN LLP
sshockley@defur.com

James Russell Williams
DEFUR VORAN LLP
jwilliams@defur.com